11 JOHNSON, Justice*
This case involves a dispute brought before the Louisiana Public Service Commission *369 concerning the right to provide water service to a subdivision located in Ascension Parish. The issue which must be resolved is whether the Public Service Commission was arbitrary, capricious, abused its authority or improperly considered the factual evidence when it dismissed plaintiffs complaint.
FACTS AND PROCEDURAL HISTORY
On November 30, 1993, the developers of Manchac Plantation, a subdivision located in Ascension Parish, executed a contract for water service with Capital Utilities Corporation (hereafter referred to as “Capital”). Under the terms of the. contract, Capital would install water mains to serve the three proposed filings of the subdivision. The parties agreed that a 100’ x 150’ piece of property at one end of the development would be designated as the well site. Capital would put in the well and a water line from the well along Perkins Road to reach all of the lots in Phase 1 of the development. Upon execution of the contract, Capital immediately began construction on the first well and put in a four-inch line to serve Phase 1.
On February 18, 1994, the developers of Manchac Plantation sold approximately fifty acres of the original parcel, consisting partly of the proposed |2first and second filings, to other developers. These developers proceeded to develop this portion of land as a new subdivision known as “Manchac Crossing”. Included within the fifty acre tract designated to become Manchac Crossing was the piece of land designated as the well site in the contract between Capital and the developers of Manchac Plantation. An Act of Donation was executed between the developers of Manchac Crossing and Capital regarding that portion of land designated as the well site “in accordance with a prior agreement between Manchac[1] and Manchac Plantation, Inc.”
Capital then submitted a proposal to the developers of Manchac Crossing to provide water service to the new subdivision according to the terms of the contract with the developers of Manchac Plantation. The developers of Manchac Crossing did not accept the proposal submitted by Capital. Instead, they contracted with Parish Water Company (hereafter referred to as “Parish”) to provide water service.'
The developers of Manchac Crossing targeted as its market, residents of Baton Rouge interested in moving to Ascension Parish, but not interested in giving up the amenities such as the quality of water service available in East Baton Rouge. The contract required that Parish provide specific services to Manchac Crossing to include eight-inch lines within the subdivision, water capacity and pressure sufficient for fire protection, fire hydrants, water which meets both primary and secondary standards, and continuous, uninterrupted service. On March 17, 1994, Parish applied to the Louisiana Public Service Commission (hereafter referred to as the “Commission”) for a letter of non-opposition to its acquisition of all common stock of the company known as Lambert Utilities, Inc., which operated water systems in Ascension Parish. Parish stated that it intended to construct and extend new water mains over to the Lambert systems without an increase in the rates to UParish’s and Lambert’s customers. . Responding to Parish’s request, on April 20, 1994, the Commission stated that the request had been published, that no opposition had been received during the twenty-five day waiting period, and that the Commission had no opposition to the terms of the agreement reached between Lambert and Parish.
On August 30, 1994, Capital filed a complaint with the Commission requesting a hearing because of an alleged invasion of its territory. The complaint was docketed as number “U-21139”. The matter was published in the Commission’s Official Bulletin on September 23, 1994. A hearing was held on November 18, 1994. This matter was consolidated for hearing with another complaint, [2] which was separately decided by the *370 Commission. At the conclusion of the hearing, counsel for Parish filed a motion requesting that a ruling be deferred until the Commission acted on its petition to amend the January 18,1954 General Order.
1954 General Order
Evidence in the record shows that the Commission’s General Order of 1954 entitled In re: Definition of Territory Water and Gas Utility states:
At a session of the Louisiana Public Service Commission held at its office in Baton Rouge on December 15, 1953, the matter of the invasion of each others territory by Gas and Water Public Utilities was considered.
As a result, it appears necessary and desirable for this Commission to adopt an order pertaining to the invasion of territory by a gas or water public utility of another like public utility already serving or making available the same commodity in a satisfactory manner.
For the purpose of this order the “territory” of a gas or water utility shall be determined by the existence of mains, or by areas that are readily accessible by extensions thereof that are economically feasible, and will not necessarily be Uconfined strictly to customers already receiving service.
It is the opinion of this Commission that in order to effect economies in the service of gas and water and thus keep rates therefor within reasonable bounds, the paralleling of mains, or the extension of mains to serve customers readily accessible by a public interest, and such practices frequently lead to unwise expenditures and investments which ultimately become a burden on the ratepayers. It is accordingly
ORDERED
That no extensions of mains shall be made by Water or gas Public Utility that will duplicate the service of another like utility serving the same commodity, nor shall extensions be made to serve customers that could be served by a Public utility already in existence in an economic and justifiable manner. In cases where it may be economically feasible for more than one utility company to serve a given customer or area, service shall be rendered by that company which can do so with the shortest, or least expensive extension. If a Public Utility, for good cause, refuses to serve a prospective customer within its defined territory, another like utility may serve the said customer upon proper written authority of this Commission. And it is further
ORDERED
That if economies can be effected in the construction of so-called “feeder” mains by a utility company through the territory already being served by another public utility, such construction shall not be regarded as an “invasion” so long as no such feeder mains are tapped for service in the said territory. In the event that a tap from the same feeder main is necessary, or desirable, it shall be made only upon separate and specific written authority of this Commission.
Amended General Order
On December 14, 1994 while in Business and Executive Session, the Commission voted to grant Parish’s motion to defer a ruling. On June 5, 1995, the Commission issued an order amending the January 18,1954 General Order. The amended order, drafted to prohibit duplication of services and paralleling of mains by water utilities, provides:
After discussion, and in light of problems that have arisen under the General Order dated January 18, 1954 as it relates to the providing of water service, the Commission voted to amend its general Order of January 18, 1954 to provide a definition to “mains;” to prohibit the providing of service by a water utility to a consumer who is already receiving water service from another water utility or who is located within three hundred feet of another water utility’s main; and to provide a mechanism for consumers to petition the Commission and obtain release from service from a water utility which would oth *371 erwise have exclusive service rights upon showing that the service being received is inadequate. The General Order dated January 18, 1954 remains unchanged as to Gas Utilities.
JsACCORDINGLY, IT IS ORDERED THAT:
No water utility shall construct or extend its facilities or furnish or offer to furnish water service to any point of connection which at the time of the proposed construction, extension or service is receiving regular service from another water utility, except with the written consent of such other water utility; nor shall any water utility construct or extend its facilities or furnish or offer to furnish water service to any point of connection which is located within three hundred feet of a water main of another public utility which is capable of providing water in sufficient quantity and at sufficient pressure as is required by the consumer at the point of connection, except with the written consent of such other public utility.
Any consumer receiving service from a water utility who feels aggrieved with the service being offered to or received by him may apply to the Louisiana Public Service Commission for ran order directing his present supplier to show cause why the consumer should not be released from said suppler, and if the commission shall find that the service rendered to such consumer is inadequate for any reason whatsoever and will not be rendered adequate within a reasonable time not to exceed six (6) months, the release shal be granted, subject to the folowing conditions: 1) the consumer shal pay for any and al necessary and LPSC approved fees or costs associated with the disconnection of service from the previous provider; 2) the consumer shal pay for any and al necessary and LPSC approved fees associated with the connection to the new provider; and 3) the previous provider shal return any deposit to the consumer after alowable deductions or additions.
For purposes of this General Order the following terms shal have the folowing definitions:
1) “Consumer” shall be defined as any retal customer of a water utilty, including a developer of a project requiring water service.
2) “Main” shal be defined as a water Ine of (8) or more inches in diameter which is used primarily for transmission or interconnection functions and which maintains an average operating pressure of 45 psi during normal daly periods.
3) “Point of Connection” shal be defined as the meter location or the point where the facilities of the water company meet the facilities owned by the consumer.
4) “Water .Utility” shall be defined as a public utility subject to the jurisdiction of the Louisiana Public Service Commission engaging in the retal sale of water.
I.
On November 18, 1994 this matter was brought before Hearing Examiner, Robert E. Crowe and taken under advisement. In a seven-page recommendation to the Commission dated January 19, 1995, several factors were examined to |6determine whether there was a violation of the Commission’s General Order of 1954. His conclusions were spit regarding which company should serve Manchac Crossing with water service. Regarding the definition of “territory” for water and gas utilities, the hearing examiner concluded that Manchac Crossing was Capital’s territory since it had a presence in the subdivision, and a well on a lot donated by Mane-hac Crossing which was then serving the customers in the Manchac Plantation Subdivision. Also, Capital instaled a main which ran from the wel site along Perkins road to Manchac Plantation Subdivision and ran along 14 lots of Manchac Crossing.
Other issues brought out in the ease were the definition of “feeder” main and “the same commodity”. Because there was no guidance as to what constitutes a “feeder” main, the hearing examiner determined that Parish should be allowed to pick up any customers off the proposed mains according to the 1954 General Order. .
In answering the question whether the water provided by Capital is the “same com *372 modity” as that of Parish, the hearing examiner provided a split recommendation. He opined that if “water is water” then the case should be decided by the issues of territory and the definition of feeder main. However, if the Commission considers water to include the services it provides, Parish should be allowed to serve the subdivision in question since Parish was not providing the “same commodity”. Testimony proved that Parish’s water was generally cleaner and did not clog shower heads or permanently stain appliances. Also, fire protection was a concern of the developers and the evidence showed that Capital was incapable of providing the type of fire protection sought by the developers of Manchac Crossing.
On April 1, 1996, Hearing Examiner Crowe issued an updated memorandum to the Commission which encompassed the rule changes as stated in their Amended | yGeneral Order dated June 1, 1995. The primary changes in the updated recommendation concern the issue of defining the “same commodity”. The hearing examiner concluded that this issue is eliminated under the 1995 General Order because the consumer can require that the water be supplied in a sufficient pressure for his purposes, such as requiring fire protection. Testimony showed that only Parish can provide sufficient water pressure to provide the desired fire protection.
Testifying at the hearing was James Le-Blane, Chief of the volunteer fire department for Prairieville which is located within Ascension Parish. He further testified that he is also a member of the Fire Board which falls under the jurisdiction of the Ascension Parish Council, and President of the Parish Aid Association which encompasses every fire department in Ascension. His testimony was that he engaged in discussions with Parish’s officials regarding the installment of fire hydrants. Parish planned to install seven hydrants in the Prairieville area at no cost to the residents or fire department. Also, he testified that the fire hydrants provided the best water source to combat fires, and with them present, an area’s fire rating improves which decreases the cost of insurance to the property owners.
The hearing examiner’s recommendations were placed on the agenda of the Commission’s Business and Executive Session on April 17, 1996. The Commission reviewed the recommendations and after hearing arguments from attorneys representing both Capital and Parish, the Commission allowed testimony from Assistant Secretary, Brian A. Eddington. Mr. Eddington informed the Commission that the hearing examiner (Robert Crowe) failed to address certain factors under the 1954 General Order that were worthy of consideration. His recommendation was to remand this matter to consider issues that were not addressed, then allow discussion of the matter at the next meeting. A motion was then passed to remand Rthe case to a different hearing examiner and take the matter up at the next meeting.[3] The Commissioners unanimously voted to remand the matter to another administrative law judge with instructions to review the record, schedule a rehearing if additional information was needed, and to make a recommendation to the Commission. The case was then remanded to Valerie Seal Meiners, Chief Administrative Law Judge.
II.
After reviewing evidence in Capital’s complaint, the new hearing officer concluded that a rehearing was unnecessary. Her recommendation was issued on May 10, 1996, concluding that Parish’s proposed service to Manchac Crossing does not violate the Commission’s General Order of 1954. Her findings of fact and conclusions of were law were then adopted by the Commission when it issued its order of May 29, 1996, dismissing Capital’s complaint by a vote of 4-0.[4]
The decision to allow Parish the right to serve the residents of Manchac Crossing was based on several conclusions. As determined by Hearing Examiner Meiners and adopted by the Commission:
*373 a) Ascension Parish does not have a unified infrastructure supplying water, but instead, water systems have been constructed across the parish to serve individual subdivisions as they are developed;
b) The water systems serving Ascension have not provided water at a capacity and pressure sufficient to provide fire protection, while the residents there have demonstrated an interest in upgrading fire protection capability by making fire hydrants available to have a continuous supply of water to combat fires. Moreover, in 1994, the residents passed a one-half cent sales tax with a portion (one-third) going to the fire departments of Ascension Parish, while a special commission investigated the costs of putting-in fire hydrants;
e)Testimony showed that the presence of fire hydrants improved an area’s rating with the Property Insurance Association of Louisiana, thereby reducing insurance premiums;
|9d) The State Department of Health and Hospitals received numerous complaints from Capital’s customers due to the presence of iron and manganese in their water, which may have violated the secondary standards of the Federal Safe Drinking Water Act of 1974 concerning the aesthetic quality of water;
e) Other customers of Capital living in different subdivisions in Ascension Parish who were not being served from the well designed to serve Manchac Crossing, experienced problems with water color, odors, particles therein, sediment left in appliances, stained appliances and insufficient water capacity;
f) In the event of a power outage, such as occurred during Hurricane Andrew, water service would be interrupted once the water contained in the pressure tank is used up. Fifty of Capital’s systems were down on the first day and some were out for as many as three or four days. In order to serve these customers, in Ascension Parish, Capital had to set up a schedule to make rounds to each subdivision with generators;
g) The developers of Manchac Crossing, perceived their market to consist of Baton Rouge residents interested in moving to Ascension Parish to have access to Ascension’s school system while maintaining certain standards of living enjoyed in Baton Rouge. For this reason, the developers of Manchac Crossing designed the subdivision to have underground utilities, curb and gutter streets, and sidewalks. The developers set out tp obtain other amenities available in Baton Rouge, such as water guaranteed to meet both primary and secondary standards, sufficient water capacity and pressure as to provide fire protection, fire hydrants, and uninterrupted water service;
h) Capital acknowledged that it cannot serve the lots in Manchac Crossing from the existing well and four-inch line, and will have to construct a second well and an additional water line in order to serve the residents of Manchac Crossing.
i) Capital faded to present any evidence as to the cost of providing fire protection, however its representatives informed the developers of Manchac Crossing that the additional costs associated with elevated service, increased water capacity, and a pump monitoring system would approximate $250,000.00.
j) Parish’s proposal to provide water service to Manchac Crossing would be $123.00 per lot and included water guaranteed to meet both primary and Secondary standards, sufficient water capacity and pressure as to provide fire protection, fire hydrants, as well as uninterrupted water service; and
k) Capital’s per lot price of $188.00 proposed to Manchac Crossing for providing a lesser service (well with four-inch line, insufficient fire protection, and interrupted service) exceeded the per-lot price offered by Parish.
In granting approval of Parish’s proposal to provide water service to Manchac Crossing, the Commission determined that Manc-hac Crossing was not within Capital’s “territory”. They then concluded that Parish’s proposed water service would not be a duplication of service, and therefore did not violate its 1954 lipGeneral Order because Par *374 ish’s service consisted of elements not being offered by Capital.
The Commission declined to give retroactive application to the 1995 General Order, but nonetheless determined that Parish’s proposal to provide water service to Manchac Crossing would not be prohibited under the subsequent order. The evidence showed that Manchac Crossing was not already receiving water service from Capital or any other water company when Parish offered to provide service, therefore Parish would not be providing service to a customer who was already receiving service from another water utility. Although Parish’s point of connection with Manchac Crossing was be within three hundred (300) feet of Capital’s existing line, Capital’s four-inch was less than the eight inches required in the 1995 General Order. Since Capital’s existing line was incapable of providing the water quantity and pressure that the developers of Manchac Crossing needed, Parish’s proposal did not violate the 1995 General Order. On May 29, 1996, the Commission voted to dismiss the complaint.
Pursuant to La. R.S. 45:1192, Capital filed a petition for review of the Commission’s order along with a verified petition seeking injunctive relief with the 19th Judicial District Court in East Baton Rouge. Finding that the Commission’s reasons for dismissing the complaint were not arbitrary, capricious, or an abuse of authority, its decision was affirmed.
ANALYSIS
The Public' Service Commission is vested with the authority to regulate all common carriers and public utilities and has such other regulatory authority as provided by law. It is charged with enforcing and has the authority to establish reasonable rules, regulations and procedures necessary for the discharge of its duties. See La. Const. Art. 4, § 21(B). Orders of the Commission are presumed Into be valid. South La. Elect. Coop. Assoc. v. Louisiana Public Service Comm’n, 367 So.2d 855 (La.1979).
Our ease law clearly provides that in order to overturn a decision of the Commission, petitioner must show that the decision was arbitrary, capricious, or shown to be an abuse of the Commission’s authority. A recent decision rendered by this court provides a very through analysis regarding the proper standard to be employed when reviewing decisions of the Commission. In Plantation v. La. Public Service Com’n, 96-1423 (La. 1/14/97); 685 So.2d 107, 109, 110 we stated:
“The general rule is that an order of the Public Service Commission should not be overturned unless it is shown to be arbitrary, capricious, a clear abuse of authority, or not reasonably based upon the factual evidence presented. Washington St. Tammany Electrical Coop., Inc. v. Louisiana Public Service Comm’n, 95-1932 (La.4/8/96), 671 So.2d 908, 912; Radiofone, Inc. v. Louisiana Public Service Comm’n, 573 So.2d 460, 461 (La.1991). The function of the reviewing court is not to re-evaluate and re-weigh the evidence, or to substitute its judgment for that of the Commission. Washington St. Tammany, supra, at 912; Louisiana Power & Light Co. v. Louisiana Public Service Comm’n, 343 So.2d 1040, 1044 (La.1977). The Commission is entitled to deference in its interpretation of its own rules and regulations, though not in its interpretation of statutes and judicial decision. Washington St. Tammany, supra, at 912; Dixie Electric Membership Corp. v. Louisiana Public Service Comm’n, 441 So.2d 1208, 1211 (La.1983).”
To overturn an order rendered by the Commission, the party attacking the decision bears the high burden of demonstrating that it is defective. La. Power & Light v. La. Public Service, 609 So.2d 797 (La.1992). Following these legal principles, the issue which must be decided is whether the Commission’s ruling was arbitrary, capricious or a clear abuse of authority, or not reasonably based upon the factual evidence presented.
Evidence in this case shows that the Commission’s adoption of the hearing examiner’s recommendation was affirmed by the trial judge because Capital failed to meet its burden of proof that the decision was arbitrary, capricious, a clear abuse of authority, or that it was not reasonably based on the *375 facts presented. The record shows that several of Capital’s customers complained of poor water quality and | ^pressure problems. Some witnesses who testified before the initial hearing examiner stated that they would not drink Capital’s water but instead, purchased bottled water for drinking and cooking. Other Capital customers complained that their water permanently stained their appliances. Further testimony proved that the residents of Manchac Crossing would have a more favorable insurance rating with Parish as their water service supplier. Parish has the capability to install fire hydrants and water mains that are larger than those being offered by Capital.
Additional factors indicating Capital failed to meet its burden of proof include Parish’s guarantee to meet both primary and secondary standards of the safe Drinking Water Act, while Capital had only set the goal of meeting primary standards. Economically, the proposal submitted by Parish to provide a more superior product, one guaranteed to meet both primary and secondary standards, sufficient water capacity and pressure to provide fire protection, fire hydrants and uninterrupted service, would cost the developers of Manchac Crossing, $123.00 per lot, as compared to Capital’s water service at $188.00 per lot. Clearly, Parish’s product cannot be viewed as the “same commodity”, but one which is superior. Accordingly, the facts of this case show that the Commission was correct to conclude that Parish’s proposal to provide water service to Manchac Crossing does not violate its 1954 General Order:
Finally, Capital complains that the contract it executed with the developers of Manchac Plantation on November 3, 1993, gave it the right to provide water service to Manchac Crossing despite the sale which took place on February 18, 1994. However, a review of the contract reveals that if there was any breach of the agreement, Capital certainly has to bear some responsibility. In pertinent part, paragraph 2- of the contract states ‘Whereas, the development of said subdivision requires the installation and construction of the approved and adequate water | ^distribution system”. Clearly, the evidence in this ease shows that the water service provided by Capital is much less than adequate considering the problems experienced by its customers.
DECREE
For the foregoing reasons, Capital has failed to meets its jurisprudential burden of proof. Accordingly, the decision rendered by the trial court is affirmed.
Affirmed and Rendered.

 Pursuant to Rule IV, Part 2, Section 3, C J. Ca-logero was not on panel.

. The Act of Donation reveals that the word "Manchac” is referring to Manchac Crossing.

. The complaint consolidated with this case was Docket No. U-20989 and entitled "Capital Utilities Corporation versus Parish Water Company, d/b/a Lambert Utilities, Inc. In Re: Alleged Violation of Louisiana Public Service Commission’s General Order Entitled ‘Definition of Territory of Water and Gas Utilities’ by Attempting to serve *370 Acadia Subdivision, Ascension Parish, Louisiana”.

. Commissioner Dixon moved that the case be remanded to another hearing examiner, one with more experience in the area of water utilities.

. Don Owén, Commissioner for District V was absent.